AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Email Accounts for (1) Dreamhost, (2) Google Inc.,<br>(3) Yahoo Inc., and (4) Microsoft Corporation, as<br>more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)    Case No.    MJ19-026 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Email Accounts more fully described in Attachment A, incorporated herein by reference.

located in the <u>Northern and Central District of California and Western District of</u> Washington, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. § 1341 and 1343;<br>and 18 U.S.C. § 1956 | Mail and Wire Fraud<br>Money Laundering | |

The application is based on these facts:

✓   See Affidavit of FBI Special Agent Cory Cote, continued on the attached sheet and incorporated herein.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

CORY COTE, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____01/18/2019_____

_____
*Judge's signature*

City and state: Seattle, Washington

BRIAN A. TSUCHIDA, United States Magistrate Judge
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

## Places to Be Searched

This warrant applies to information associated with the email address of info@vansicklebc.com that is stored at premises owned, maintained, controlled, or operated by Dreamhost, an Internet Provider headquartered at 707 Wilshire Blvd., Ste. 5050, Los Angeles, California.

This warrant applies to information associated with the email addresses vansickleconsulting@gmail.com and vansicklebusinessconsulting@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google Inc., an Internet Service Provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

This warrant applies to information associated with the email address allabouttroy49@yahoo.com  that is stored at premises owned, maintained, controlled, or operated by Yahoo, Inc., and Internet Service Provider headquartered at 701 1st Ave., Sunnyvale, California.

This warrant applies to information associated with the email address allabouttroy@hotmail.com that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, and Internet Services Provider headquartered at One Microsoft Way, Redmond, Washington.

Attachment A - 1

# ATTACHMENT B

## Particular Things to be Seized

### I.        Information to be disclosed by the Internet Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Internet Service Provider ("Provider"), regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.        The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, attachments to the emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.        All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.        The types of service utilized;

d.        All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.        All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**II.    Information to be seized by the government**

For each account or identifier listed on Attachment A, all information described above in Section I, that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § § 1341 and 1343 (Mail and Wire Fraud) and 18 U.S.C. § 1956 (Money Laundering), pertaining to the following matters occurring between May 2011, and July 2014 (unless other dates are otherwise indicated):

(1)    Subscriber details provided by the user when creating the account (regardless of the date the account was set up);

(2)    Subscriber information, including names, addresses, dates of birth, contact details and any other personal information supplied by the subscriber such as the means and source of payment for any service (regardless of the date the account was set up);

(3)    Communications between the Internet Service Provider and any other person regarding the SUBJECT EMAIL ACCOUNTS, including contacts with support services and records of actions taken (regardless of the date the communications occurred);

(4)    Message header data required to trace any user associated with the account and its access;

(5)    IP log-on data for access to the accounts;

(6)    User connection information, including session times and durations and IP addresses assigned during the relevant period;

(7)    All contact lists, address lists, buddy lists or other such data associated with the account;

(8)    All calendar content;

(9)    Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

Attachment B - 2

1
2
3
4
5
6
7

(10)    Communications between TROY CLINTON VAN SICKLE and any of the following individuals: Shelley Grimes; Susan Beidel; Robert Allen; Larry Allen; Richard Ames; Ed Parker; David Peterson; Osborne Sims; James DeBolt; Cheryl Oler; Phillip Zappone; Julie Zappone; Chris Myers, Ray Nelson; Phyllis Nelson; Paul Hackspiel; Manfred Hackspiel; David Norwood; Valarie Norwood; Len Brandt; Tim Myers, Lynn Myers;  Mark Bucklin; FBI SA Spencer Walker; DFI Examiner Janet So; and Robert Rash

8
9
10

(11)    Communications in which TROY CLINTON VAN SICKLE discusses the transfer of funds to any account opened in the name of Atlantic Management;

11
12

(12)    Communications in which TROY CLINTON VAN SICKLE discusses the purchase of a residence at Palm Desert, California;

13
14

(13)    Communications in which TROY CLINTON VAN SICKLE discusses the operation of a trucking company or the sale of a trucking company; and

15
16
17

(14)    Communications in which TROY CLINTON VAN SICKLE, during November 2016, states to Shelley Grimes the words "Smoking Gun."

18
19
20
21
22
23
24
25
26
27
28

Attachment B - 3

AFFIDAVIT OF CORY COTE

STATE OF WASHINGTON　　　)
　　　　　　　　　　　　　　)
COUNTY OF KING　　　　　　)

　　　I, Cory Cote, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

　　　1.　　I am a Special Agent of the FBI, and have been so employed for over 23 years.  I am currently assigned to the Seattle Field Office.  As a Special Agent, I investigate criminal violations of the United States Code found in Titles 18 and 21.  I have investigated organized crime, bank robberies, kidnapping, drug trafficking, gang crimes, violent crime, public corruption and various fraud offenses for the last nineteen years.  Prior to that, I worked on an international terrorism squad in the Chicago Field Office for approximately four years.  I am familiar with, and have initiated, managed and participated in, all of the usual methods of investigation, including, but not limited to, analysis of documentary evidence, witness interviews, financial investigation, visual surveillance, the questioning of subjects, the use of informants, the purchase of drug evidence, the use of pen registers, the analysis of telephone and email records, the implementation of undercover operations, the examination of electronic records and data stored on digital devices such as computer hard drives, digital cameras and cellular telephones, the use, management, review and execution of Title III investigations and the execution of search and arrest warrants.

　　　2.　　The FBI initiated the instant ongoing criminal investigation of TROY CLINTON VAN SICKLE ("VAN SICKLE") during September 2016, as a result of receiving a criminal referral from Washington State Department of Financial Investigations ("DFI").   I was assigned to the investigation after FBI SA Jeremy Blauser

1   transferred units during June 2017.  This is a joint investigation, which I am working with

2   representatives of DFI.

3          3.       Pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), I make

4   this Affidavit in support of an Application for Search Warrants requiring (1) Dreamhost,

5   an Internet Service Provider headquartered at 707 Wilshire Blvd., Ste. 5050, Los

6   Angeles, California 90017; (2) Google Inc., an Internet Service Provider headquartered at

7   1600 Amphitheatre Parkway, Mountain View, California 94043; (3) Yahoo, Inc., an

8   Internet Service Provider headquartered at 701 1st Ave., Sunnyvale, California 94089,

9   and (4) Microsoft Corporation, an Internet Service Provider headquartered at One

10  Microsoft Way, Redmond, Washington 98052, to (1) search information associated with

11  the email accounts identified in the spreadsheet below, and in Attachment A (the

12  "SUBJECT EMAIL ACCOUNTS"), and (2) disclose to the government copies of the

13  information (including the content of communications) further described in Section I of

14  Attachment B.  Upon receipt of the information described in Section I of Attachment B,

15  government personnel will review that information to locate the items described in

16  Section II of Attachment B.

| SUBJECT EMAIL ACCOUNTS to be Searched: | Paragraphs In Which SUBJECT EMAIL ACCOUNTS Are Discussed Herein: |
|---|---|
| Dreamhost: info@vansicklebc.com | 44, 46, 51, 52, 59, 82, 101, 109, 124 |
| Google: vansicklebusinessconsulting@gmail.com | 46, 47, 78, 83 |
| Google: vansickleconsulting@gmail.com | 46, 117, 120, 145, 157 |
| Yahoo: allabouttroy49@yahoo.com | 51, 52, 53, 54, 56, 58, 59 |
| Microsoft: allabouttroy@hotmail.com | 33 |

Agent Cory Cote Affidavit- 2

4. The investigation has revealed that VAN SICKLE used the above-referenced email accounts while committing criminal violations of federal law, including 18 U.S.C. § 1341 and 1343, Mail and Wire Fraud, respectively, 18 U.S.C. § 1349, Conspiracy to Commit Mail and Wire Fraud, and 18 U.S.C. § 1956, Money Laundering. I make this request to search the above-referenced accounts for evidence, fruits, and instrumentalities of these offenses.

5. I note that a federal grand jury in the Western District of Washington has found probable cause to believe that VAN SICKLE has committed two of the aforementioned crimes. On October 17, 2018, the grand jury returned an Indictment charging VAN SICKLE in Counts 1 and 2 with Mail Fraud and in Count 3 with Conspiracy to Commit Mail and Wire Fraud. At paragraph 15, the Indictment summarizes the alleged scheme to defraud:

> Beginning in approximately May 2011, and continuing through approximately March 2014, TROY CLINTON VAN SICKLE operated a fraudulent asset-recovery and advanced-fee scheme. That is, for a fee, TROY CLINTON VAN SICKLE offered to help investors recover losses they had incurred while investing through Lakemont and Larrick. His true intent, however, was to (1) retain and convert to his own use any funds that he actually recovered and (2) steal additional money from the investors. Among other means, TROY CLINTON VAN SICKLE stole money from the investors by borrowing money from them which he did not intend to repay and charging them for services he had not provided and did not intend to provide.

Trial on those charges is scheduled for August 9, 2019.

6. The facts set forth in this Affidavit are based on my personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the Application for Search Warrants, it does not set forth each and every fact that I or others have learned during the course of this

1   investigation.  I have set forth only the facts I believe are relevant to the determination of

2   probable cause to believe that evidence, fruits, and instrumentalities of violations of 18

3   U.S.C. §§ 1341 and 1343, Mail and Wire Fraud, 18 U.S.C. § 1349, Conspiracy to

4   Commit Mail and Wire Fraud, and 18 U.S.C. § 1956, Money Laundering, will be found

5   in records relating to the SUBJECT EMAIL ACCOUNTS.

6         7.      As further discussed herein, relevant events have been investigated by

7   different investigative agencies, including DFI, the FBI, and the Redmond Police

8   Department ("RPD").  As a result, many witnesses have been interviewed on numerous

9   occasions by government civil and criminal investigators.  I have reviewed reports of

10  interviews and depositions taken during the overlapping investigations, and have relied

11  on them herein.  In doing so, I often refer generally to statements made to "investigators,"

12  rather than identifying each and every time a witness repeated a fact to a DFI, FBI, or

13  Redmond PD investigator.  I also note that in several paragraphs below I refer to "a

14  review of bank records."  In citing that review, I note that I did not personally perform it,

15  but relied on the financial analysis conducted by DFI Financial Analyst Michelle Mack,

16  who is assigned to the investigation.

17        8.      Shelley Grimes is one of the witnesses who has been interviewed on several

18  occasions by civil and criminal investigators from DFI, the FBI, and the Redmond PD.

19  In addition to discussing the case with investigators, Grimes has produced hard copies of

20  relevant emails and authorized investigators to search for relevant email and other

21  evidence which might be located in (1) a cell phone she had used and maintained, (2) her

22  laptop, and (3) her AOL email account.   I note that while I did not personally conduct all

23  of the searches of these sources, I have personally reviewed all of the emails I have

24  referenced below.  Because many of the referenced emails were recovered from more

25  than one source, when I discuss them, I generally refer to them as "Grimes' email"

26  without identifying all of the sources from which they were recovered.

27

28

Agent Cory Cote Affidavit- 4

## II.  STATUTORY AUTHORITY

9.     Title 18, United States Code, Section 1341, Mail Fraud, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purposes of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . shall be fined under this title or imprisoned not more than 20 years, or both.

10.     Title 18, United States Code, Section 1343, Wire Fraud, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purposes of executing such scheme or artifice shall be fined under this title or imprisoned not more than 20 years, or both.

11.     Title 18, United States Code, Section 1956, Money Laundering, provides in relevant part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (B) knowing that the transaction is designed in whole or in part –
>
> (i)     to conceal or disguise the nature, the location, the source, or the control of the proceeds of specified unlawful activity
>
> Shall be sentenced to a fine of not more than $500,000 . . . or imprisonment for not more than 20 years, or both.

Agent Cory Cote Affidavit- 5

1 I note that Mail and Wire Fraud are considered specified unlawful activity as that term is

2 used in the Money Laundering statute.  18 U.S.C. § 1956(c)(7); 18 U.S.C. 1961(1).

### III.   SUMMARY OF THE INVESTIGATION

**THE INVESTMENT PROMOTERS' SOLICITATION OF TROY VAN SICKLE'S ASSISTANCE**

12.   Larry Allen and Rick Ames have informed Investigators that between April 2008, and March 2010, they operated Lakemont Commercial Consulting LLC ("Lakemont") and Larrick Holdings LLC ("Larrick"), in Bellevue, Washington.  Through those entities, they offered investors the opportunity to make short-term, high-interest loans to various individuals and entities.  Ed Parker, who operated Brighton Health Group, and Dan Peterson, who operated TenStar Development, were two individuals who received investors' funds while Lakemont and Larrick were in operation.

13.   According to Allen and Ames, by the spring of 2011, most investments were failing to perform as had been represented in the Promissory Notes issued to the investors, and the investors were angry.  Around that same time, Ames and Allen shut down Lakemont and Larrick, and Ames entered into a new partnership with Ed Parker.

14.   According to Allen, after he consulted with TROY VAN SICKLE  – who Allen knew because VAN SICKLE had fathered a child with Allen's daughter –  VAN SICKLE agreed to act as Allen's point-of-contact with the investors.  Allen then informed investor Shelley Grimes that VAN SICKLE might be able to help the investors.

15.   According to Allen, he also introduced VAN SICKLE to his business partner, Rick Ames.  After he did so, Ames and VAN SICKLE met with the investors outside of Allen's presence.

16.   My review of the transcript of a deposition DFI took from TROY VAN SICKLE during September 2016, has revealed that during the deposition VAN SICKLE confirmed that Allen introduced him to the Lakemont and Larrick investors.  VAN SICKLE testified that between 2007, and 2010, while he was incarcerated by the State of Washington, he spent most of his time studying civil and criminal law.  Shortly after

1  being released, Allen asked him to assist individuals to whom Allen and Ames had

2  offered investments.  According to VAN SICKLE, after meeting with investor Shelley

3  Grimes, he agreed to help seven investors determine "how a fraud had taken place."

4  Between 2011 and 2016, these seven investors constituted the only clients of an asset

5  recovery business VAN SICKLE formed.

6  **TROY VAN SICKLE'S FRAUDULENT PROMOTION OF A PURPORTED**
7  **ASSET RECOVERY BUSINESS**

8       17.     Shelley Grimes has informed investigators that during May and June 2011,

9  VAN SICKLE contacted Grimes.  VAN SICKLE told Grimes that he was an expert in

10  recovering failed investments, and that, for a fee, he would seek the return of investors'

11  funds.  According to Grimes, in addition to making verbal representations to her, VAN

12  SICKLE sent her a number of emails.

13       18.     My review of one of the emails that Grimes provided to investigators has

14  revealed that on June 8, 2011, VAN SICKLE, using the email address

15  allabouttroy49@yahoo.com, sent Grimes an email in which he provided Grimes with the

16  telephone number of a proposed reference named Phil Zappone.  In the email, VAN

17  SICKLE claimed that he had recovered in excess of $200,000 on Zappone's behalf.

18       19.     According to Grimes, upon receiving that email, she called the number

19  VAN SICKLE provided for Zappone.  The male who answered the phone confirmed that

20  VAN SICKLE previously had recovered a large amount of money on his behalf.

21       20.     My review of Sprint telephone records has revealed that the number VAN

22  SICKLE provided for Zappone was subscribed to by Julie Zappone, Phil Zappone's wife,

23  and that, in fact, on June 9, 2011, Grimes placed a call to the telephone number from her

24  landline.

25       21.     When FBI and DFI investigators interviewed Phil Zappone on January 11,

26  2017, and July 7, 2017, he denied that he had acted as a reference for VAN SICKLE.

27  During a subsequent interview on July 12, 2017, however, Zappone stated that he

28  believed that pursuant to VAN SICKLE's request, he had told Grimes that VAN SICKLE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  had recovered a large amount of money for him.   While Zappone noted that during 2011,

2  he was taking drugs, and, as a result, his memory was poor, he was adamant that VAN

3  SICKLE never recovered any money on his behalf.

4  **THE INVESTORS' RETENTION OF TROY VAN SICKLE'S ASSET**
5  **RECOVERY SERVICES**

6      22.      According to Grimes, pursuant to VAN SICKLE's representations, Grimes

7  and other investors, including Chris Myers, Ray and Phyllis Nelson, Paul Hackspiel, and

8  David and Valarie Norwood (hereinafter, referred to as "the investors") hired VAN

9  SICKLE.

10     23.      Most of the investors have provided investigators with copies of various

11  Consulting Agreements, dated from June 2011, to August 2012, that they entered into

12  with VAN SICKLE.  My review of those Agreements has revealed that the investors

13  agreed that, for performing "an investigation of recovery of funds against Dan Peterson,

14  Rick Ames, and Ed Parker" they would pay VAN SICKLE (1) between $10,000, and

15  $20,000 (different investors agreed to pay different amounts), and (2) 15% of funds

16  recovered.

17     24.      A review of Chase bank records has revealed that on June 9, 2011, VAN

18  SICKLE opened Chase account No. 4425, in the name of "Troy C. Van Sickle

19  Consulting and Collections."  From June 10, 2011, through June 14, 2011, VAN SICKLE

20  deposited into the account, the fees he received from Grimes, Chris Myers, the Nelsons,

21  and Paul Hackspiel.

22  **TROY VAN SICKLE'S FRAUDULENT REPRESENTATIONS REGARDING**
23  **PAYMENTS BY RICK AMES**

24     25.      According to Grimes, after VAN SICKLE received investors' fees, he

25  repeatedly informed the investors, both in emails and verbally, that, shortly, Rick Ames

26  would repay them their lost investments.  For example, on June 19, 2011, VAN SICKLE,

27  using the email address of allabouttroy49@yahoo.com, sent Grimes an email in which he

28  stated, "Our friend Rick has called several times about getting ready for banking."

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

26.       A review of Chase bank records has revealed that, in fact, between June 2011, and August 1, 2011, Ames did make several payments to VAN SICKLE totaling approximately $16,000.

27.       According to the investors who retained him, however, VAN SICKLE did not provide any of the funds he received from Ames to the investors.

28.       According to Ames, at the time he made the payments to VAN SICKLE, VAN SICKLE told him that VAN SICKLE was going to pay the funds to an investor.  I note, however, during a subsequent polygraph examination, Ames was asked if, in fact, he had given the funds to VAN SICKLE for some other reason than delivering them to investors.  Ames answered "No" and, in giving that answer, he was found to be deceptive.

**TROY VAN SICKLE'S FRAUDULENT THEFT OF IN EXCESS OF $560,000 FROM SHELLEY GRIMES AND FRAUDULENT RECRUITMENT OF HER AS HIS AGENT**

29.        According to Shelley Grimes – who in 2011, was 58 years of age - after initially meeting with VAN SICKLE – who in 2011, was 40 years of age - to discuss her investment losses, Grimes engaged in an affair with VAN SICKLE.  That affair is reflected in the text messages that Grimes has provided to investigators.  In addition to exchanging numerous nude photos with Grimes, in the text messages he sent to Grimes, VAN SICKLE professed his love for Grimes, and proposed to marry her.  For example, VAN SICKLE sent Grimes the following text messages:

- July 24, 2011: VAN SICKLE states to Grimes, "Will (sic) be together soon. Love ya."

- August 12, 2011: VAN SICKLE states to Grimes, "please Marie (sic) me" . . . "I want to marrie (sic) you on my birthday [March 5]."

- September 2, 2011: VAN SICKLE states to Grimes, "I'm marrying you no matter what."

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

30.     According to Grimes, during the course of her affair with VAN SICKLE, Grimes sent several hundred thousand dollars to VAN SICKLE.  During August 2011, VAN SICKLE told Grimes that he could buy seven classic motorcycles from an individual named Bob Richie, for $430,000, and sell them for $1,125,000.  In addition to using approximately $90,000 of her own funds to invest in the motorcycles, Grimes – who had lost most of an inheritance while investing through Lakemont and Larrick - convinced her husband to allow her to use approximately $205,000 of his retirement fund to invest in them.

31.     According to Grimes, during mid-September 2011, VAN SICKLE told Grimes that for $250,000, Richie was willing to sell them five additional motorcycles which could be resold for a total of $1,310,000.  According to Grimes, in order to participate in the purchase of these motorcycles, she borrowed $50,000 from an individual named Richard Hansen and borrowed $200,000 from an individual named Paul Ellis, of PMB Capital.  In doing so, she agreed to repay Ellis a total of $375,000, and gave Ellis as collateral a cabin located on Whidbey Island that she had inherited. Prior to investing, Grimes drafted, and VAN SICKLE signed, a $560,000 Promissory Note, which was to supersede prior notes VAN SICKLE had issued to Grimes.

32.     According to Grimes, between November 2011, and mid-2012, VAN SICKLE told Grimes additional stories relating to the motorcycles, and, as a result, she sent him additional funds, totaling well in excess of $100,000.  During mid-2012, however, VAN SICKLE told Grimes that an individual peripherally associated with the motorcycle transactions had been arrested, and that they must never again discuss the investment over the telephone.

33.     An individual named Robert Allen has confirmed to investigators that he did sell six motorcycles to VAN SICKLE during the relevant time frame, but he sold them for far less than the amount Grimes delivered to VAN SICKLE.  In fact, he gave VAN SICKLE a particularly good price because VAN SICKLE told him he planned to place the motorcycles in a museum.  Allen also produced an email from VAN SICKLE,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

dated December 30, 2011, in which VAN SICKLE, using the email address, allabouttroy@hotmail.com, notified Allen that he was in the process of purchasing a building to use for the motorcycle museum.

34.     The evidence suggests, however, that, from the beginning, VAN SICKLE's true intent was to recruit Grimes as his agent and to steal Grimes' money.  A review of records for Chase Bank account No. 4425, opened by VAN SICKLE in the name "Troy C. Van Sickle Consulting and Collections," has revealed that on August 9, 2011, and September 19, 2011, Grimes wired approximately $295,000 and $250,000, respectively, to that account.  Of that $545,000, VAN SICKLE used only $244,000 to buy classic motorcycles from Robert Allen, however.

35.     In addition, a review records for Banner Bank account No. 5319, opened by VAN SICKLE in the name of "Van Sickle Business Consulting LLC," has revealed that during October 2011, VAN SICKLE sold some of the motorcycles for $165,000.

36.     According to Grimes, VAN SICKLE (1) did not tell her that he had retained in excess of $250,000 of the funds that she initially gave him to purchase motorcycles; (2) did not tell her that he had sold some of the motorcycles for $165,000; and (3) did not remit any of the proceeds from the sale of the motorcycles to her.

37.     Moreover, the investigation has revealed that, at the same time VAN SICKLE sent text messages to Grimes proclaiming his love for her, he not only was engaging in an intimate relationship with another woman - Susan Beidel, who also had lost money in a prior investment - he was seeking to steal funds from Beidel as well.

38.     Beidel has informed investigators that on August 11, 2011, Beidel gave VAN SICKLE $20,000 purportedly for the purchase of a container of motorcycle parts from Australia.  According to Beidel, before she invested, VAN SICKLE bought her dinner on three occasions and they had an intimate relationship.  According to Beidel, after she invested with VAN SICKLE, he failed to deliver any motorcycle parts to her, and she was able to obtain a refund of her investment only after she sued VAN SICKLE.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

39.     The investigation has revealed that only one day after Beidel delivered her $20,000 investment to VAN SICKLE, VAN SICKLE sent Grimes a text stating "please Marie (sic) me" . . . "I want to marrie (sic) you on my birthday."

**TROY VAN SICKLE'S RELOCATION TO CALIFORNIA AFTER THE FBI BEGINS ASSESSING A COMPLAINT FILED BY LARRY ALLEN AGAINST RICK AMES**

40.     On August 24, 2011, Larry Allen filed a Complaint with the Seattle FBI in which he alleged that, while they were operating Lakemont and Larrick, his business partner, Rick Ames, embezzled $5.9m of the investors' funds.

41.     According to Larry Allen, after he introduced VAN SICKLE to the investors, VAN SICKLE told Allen that the investors wanted to prosecute Allen because Ames was telling them that Allen had embezzled their funds.  According to Allen, VAN SICKLE told Allen that if Allen gave VAN SICKLE $20,000, VAN SICKLE would pay it to the investors and convince them not to prosecute Allen.  Instead of paying VAN SICKLE, Allen filed the FBI Complaint implicating Ames.

42.     On December 17, 2011, while FBI SA Spencer Walker was assessing Allen's Complaint, VAN SICKLE called SA Walker.  VAN SICKLE stated that the investors had paid VAN SICKLE between $25,000 and $30,000 to represent them and that he was figuring out the loss each investor had suffered and obtaining new Promissory Notes from Rick Ames.  VAN SICKLE stated that Ames, Allen and Dan Peterson should go to jail for fraud.  VAN SICKLE then delivered to SA Walker a box of records relating to the investments Ames and Allen had offered.

43.     My review of business records has revealed that around the time that VAN SICKLE met with SA Walker, VAN SICKLE was setting up business infrastructure which would allow him to leave Washington State, while Shelley Grimes acted as his agent in the State.  For example:

•       Washington State Secretary of State records reveal that VAN SICKLE previously had not formed a business entity in the name of "Troy C. Van Sickle

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Consulting and Collections," the name he used on the bank account into which he deposited investors' initial payments to him.  On October 12, 2011, however, VAN SICKLE formed "Van Sickle Business Consulting LLC."

- Storage Unit records reveal that on December 4, 2011, VAN SICKLE paid for a storage unit in Brentwood, CA.

- AT&T records reveal that on December 19, 2011, VAN SICKLE subscribed to an AT&T cell phone number having a California area code, that is, 925 470-0501.

44.    In addition, my review of Grimes' email has revealed that around January 2012, Grimes, working with VAN SICKLE, directed Robert Rash, a website developer, to create a website hosted by Dreamhost, an internet services provider, and an email address for Van Sickle Business Consulting LLC, that is, the website vansicklebusinessconsulting.com and the email address info@vansicklebc.com.

45.    Rash has informed investigators that Grimes initially acted as VAN SICKLE's agent in creating the website, and provided Rash with all of the content for the website.  Later, however, VAN SICKLE took over payments to host the website and worked with Rash directly.

46.    According to Rash, emails sent to the info@vansicklebc.com were forwarded to the email address vansickleconsulting@gmail.com.  Upon further investigation, however, it appears that emails sent to info@vansicklebc.com actually were forwarded to vansicklebusinessconsulting@gmail.com.

47.    A review of Grimes' email has revealed that on February 17, 2012, VAN SICKLE sent an email from vansicklebusinessconsulting@gmail.com to Grimes, in which he announced "got this one too!"  In doing so, VAN SICKLE appears to be informing Grimes that the tests she was conducting on the website vansicklebusinessconsulting.com confirmed that the website's email functionality was working correctly.

Agent Cory Cote Affidavit- 13

48.     Archived copies of the Van Sickle Business Consulting website – recovered from the website Internet Archive Wayback Machine - reveal that the website for Van Sickle Business Consulting LLC was available on the internet by February 23, 2012. Among other things, that website provided that Van Sickle Business Consulting charged $200 an hour and that clients could opt to pay VAN SICKLE an up-front "retainer" of between $5,000 and $20,000.

**TROY VAN SICKLE'S FRAUDULENT THEFT OF $75,000 FROM INVESTORS**

49.     A review of records for VAN SICKLE's Banner Bank account, No. 5319, has revealed that, after setting up this business infrastructure in Washington State, VAN SICKLE moved to California.  That is, the Banner Bank records reflect the fact that on February 29, 2012, VAN SICKLE repeatedly purchased gas while driving to Brentwood, California.  And, he did not make a similar return trip.

50.     My review of AT&T records for the cell telephone No. 925 470-0501 has revealed that after moving to California, VAN SICKLE spoke on the telephone with Grimes nearly daily – and often multiple times per day.  Specifically, on April 21, 2012, between 2:00 p.m. and 4:30 p.m., VAN SICKLE spoke on his cellphone with Grimes on three occasions, totaling approximately 20 minutes.

51.     Investor interviews and my review of Grimes' email have revealed that on that same date, April 21, 2012, at 9:07 p.m., Grimes sent an email to investors, and copied VAN SICKLE using two of his email addresses, allabouttroy49@yahoo.com and info@vansicklebc.com.  Therein, Grimes solicited funds from the investors on VAN SICKLE's behalf.  Grimes stated that according to VAN SICKLE, Ed Parker, Rick Ames' new business partner, had agreed to wire funds to VAN SICKLE for the purpose of repaying the investors.  Because of the size of the wire, however, VAN SICKLE's business account must hold $100,000, which would act as a "bond" or "insurance." While VAN SICKLE had committed to providing $25,000, the investors would be required to loan VAN SICKLE an additional $75,000.  Grimes assured the investors that their loans would never leave the bank.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

52.     My review of Grimes' email has revealed that Grimes subsequently sent a follow-up email to investors, and copied VAN SICKLE, again using two of his email addresses, allabouttroy49@yahoo.com and info@vansicklebc.com.   In that email, Grimes encouraged the investors, noting that"[W]e are so close to getting this done," and again assured them that "[T]he money [the loans that investors were to make] is secure and will not be released from the account."

53.     My review of Grimes' email has revealed that on April 23, 2012, Grimes sent an email to VAN SICKLE at allabouttroy49@yahoo.com, in which she notified VAN SICKLE that Ray and Phyllis Nelson were demanding that VAN SICKLE issue a notarized Promissory Note before they would lend VAN SICKLE the funds he was seeking.

54.     My review of Grimes' email has revealed that on April 26, 2012, at 8:36 p.m., Grimes sent a follow-up email to VAN SICKLE at allabouttroy49@yahoo.com, bearing the subject line of "Promissory note template."  In that email, Grimes stated, "Here it is.  Let me know if this one works."  Attached to the email, for VAN SICKLE's approval, was a proposed Promissory Note.

55.     My review of AT&T records has revealed that on that same date, April 26, 2012, beginning at 10:15 p.m., VAN SICKLE, using cellphone No. 925 470-0501, spoke with Grimes for approximately 50 minutes.

56.     My review of Grimes' email has revealed that the following morning, that is, on April 27, 2012, at 9:31 a.m., Grimes sent another follow-up email to VAN SICKLE at allabouttroy49@yahoo.com.  In that email, Grimes stated, "Here they are!"  Attached to the email were Promissory Notes securing loans made by (1) the Nelsons, in the amount of $20,000, (2) the Norwoods, in amounts totaling $35,000, (3) Paul Hackspiel, in the amount of $15,000, and (4) the Grimes, in the amount of $5,000.

57.     My review of AT&T records has revealed that Grimes was talking on the phone with VAN SICKLE when she sent him this email.  Specifically, the phone records

Agent Cory Cote Affidavit- 15

1  reveal that on April 27, 2012, beginning at 8:53 a.m., VAN SICKLE, using cellphone No.

2  925 470-0501, spoke with Grimes for approximately 45 minutes.

3       58.    My review of Grimes' email has revealed that on April 27, 2012, Grimes

4  sent the Nelsons an email notifying them that (1) VAN SICKLE had faxed notarized

5  copies of the requested Promissory Notes to her, and (2) she would be depositing the

6  Nelsons' [$20,000] check into a Banner Bank account.  Grimes included VAN SICKLE

7  on the cc line of the email using his email address, allabouttroy49@yahoo.com.

8       59.    My review of Grimes' email has revealed that on April 28, 2012, Grimes

9  sent an email to the investors and VAN SICKLE, using two of his email addresses,

10  allabouttroy49@yahoo.com and info@vansicklebc.com.  In that email, Grimes notified

11  the investors that VAN SICKLE had faxed copies of the Promissory Notes to those

12  investors who had loaned VAN SICKLE money, again assured the investors that their

13  loans "would be secured in the bank account until our transaction is completed," and

14  stated that she was finishing a Memorandum of Understanding.

15       60.    According to the investors, VAN SICKLE, in fact, issued Promissory

16  Notes, totaling $75,000, to those investors who loaned him funds.  My review of those

17  Promissory Notes, which he signed on April 27, 2012, before a notary public in Contra

18  Costa County, California, has revealed that VAN SICKLE promised to repay the

19  investors by May 27, 2012.

20       61.    A review of records for Banner Bank account No. 5319 has revealed that on

21  April 26 and April 27, 2011, Grimes deposited the investors' checks, totaling $75,000.

22  Contrary to the repeated promise that the funds would never leave the bank, however,

23  VAN SICKLE immediately used the investors' funds to make a rent payment in the

24  amount of $11,750, and to make a $5,000 withdrawal.  In addition, VAN SICKLE

25  withdrew $49,000 of the investors' funds by issuing a check on account No. 5319.

26       62.    A review of records for Bank of Agriculture account No. 6678, opened by

27  VAN SICKLE in the name of Van Sickle Business Consulting, has revealed that VAN

28  SICKLE deposited the $49,000 check into that account.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

63.     On the memo line of the $49,000 check, VAN SICKLE wrote the words "Sold Trucking Company."  I note that a review of records for Banner Bank account No. 5319 has revealed that no funds were deposited into it from the sale of a trucking company at any relevant time, let alone around the time VAN SICKLE issued the check for $49,000.  Based on my training and experience, I believe that in moving the $49,000 to an account opened at the Bank of Agriculture, and falsely writing "Sold Trucking Company" on the check he used to move the money, VAN SICKLE was seeking to launder the funds, that is, he was seeking to conceal the location and true source of the funds.

64.     According to investors, Rick Ames' new business partner, Ed Parker, did not repay the investors for their lost investments.  Instead, on May 29, 2012, Parker sent a memo to Ames in which he stated that he never agreed to pay Ames' debts.

65.     According to the investors, VAN SICKLE also did not repay the investors the $75,000 he borrowed from them, as he had promised.   A review of bank records has revealed that when the Promissory Notes VAN SICKLE issued became due on May 27, 2012, the account into which VAN SICKLE had moved $49,000 of the investors' funds held in excess of $47,000.  Nevertheless, VAN SICKLE did not use any of those funds to repay the investors.

**TROY VAN SICKLE'S MANUFACTURED DEFENSE TO ALLEGATIONS THAT HE FRAUDULENTLY STOLE IN EXCESS OF $560,000 FROM SHELLEY GRIMES**

66.     My review of documents obtained by DFI from VAN SICKLE has revealed that on December 12, 2011, Grimes signed a "Transaction Receipt," stating that VAN SICKLE repaid Grimes in cash the $562,000 that he had borrowed from her.  According to this Transaction Receipt, VAN SICKLE purportedly paid Grimes (1) $62,000 in $50 denominations and (2) the remaining $500,000 in $100 denominations.  In addition, on July 1, 2012, VAN SICKLE's attorney, Ed Weigelt, sent Grimes a letter stating that, in order to prepare a financial report, he needed to know the status of all of VAN SICKLE's

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   debts.   Pursuant to that inquiry, Grimes and her husband signed a Declaration in which

2   they stated that "Troy has paid and/or satisfied all loans. . . ."

3      67.    According to Grimes, while VAN SICKLE had not repaid her and her

4   husband $562,000 that they had invested with him to buy classic motorcycles, she

5   believed that VAN SICKLE actually had legitimately lost her money.  According to

6   Grimes, she signed the Transaction Receipt because VAN SICKLE asked her to and she

7   and her husband signed the Declaration because VAN SICKLE told her that he needed to

8   borrow money from Weigelt, but Weigelt would not loan him money so long as VAN

9   SICKLE had outstanding debt.

10      68.    Based on my training and experience, I believe that VAN SICKLE had

11   Grimes sign a false Declaration and Transaction Receipt in order to create a defense to

12   subsequent allegations that he had stolen the money from Grimes and her husband.  An

13   analysis of VAN SICKLE's bank accounts has revealed that from the time Grimes and

14   her husband first loaned funds to VAN SICKLE, until December 12, 2011, that is, the

15   date Grimes signed the Transaction Receipt stating that they had been repaid in cash,

16   VAN SICKLE had withdrawn from bank accounts approximately $502,000 in cash.  The

17   investigation has determined that VAN SICKLE used approximately $200,000 of those

18   proceeds to pay Robert Allen.  Accordingly, even if VAN SICKLE had used the

19   remaining $302,000 in cash withdrawals to pay Grimes, he would have been short

20   $260,000.

21   **TROY VAN SICKLE'S PLAN TO DISCONTINUE HIS PURPORTED**
22   **COLLECTION EFFORTS AGAINST RICK AMES**

23      69.    During August 2012, Rick Ames issued new Promissory Notes to the

24   investors making Ames personally liable to the investors for their losses.

25      70.    My review of a letter VAN SICKLE sent to the investors on August 12,

26   2012, has revealed that in it, VAN SICKLE (1) claimed success because he had Rick

27   Ames issue the Promissory Notes to the investors and (2) notified the investors that they

28   should hire an attorney to collect on the Promissory Notes.  In a separate document that

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   VAN SICKLE submitted to investors, VAN SICKLE maintained that the investors

2   continued to owe him 15% of the funds that they or their attorneys later collected from

3   Rick Ames.

4         71.    According to Shelley Grimes, as a condition precedent to receiving the new

5   Promissory Notes, the investors had to surrender the Promissory Notes they originally

6   had received when investing through Lakemont and Larrick.  My review of the new

7   Ames Promissory Notes also has revealed that, in accepting the Promissory Notes, the

8   investors agreed that they would not engage in collection efforts against Ames until the

9   payoff date on the new Notes, that is, January 2, 2013.

10         72.    My review of bankruptcy records filed in the Western District of

11   Washington has revealed that on April 11, 2013, Rick Ames filed Chapter 7 Bankruptcy.

12   While language included in the new Promissory Notes Ames issued to investors during

13   August 2012, assured investors that the Notes could not be discharged in bankruptcy,

14   during Ames' bankruptcy proceedings, Ames, in fact, successfully discharged the Notes.

15   **TROY VAN SICKLE'S FRAUDULENT SUBMISSION OF A FICTITIOUS**

16   **HOURLY BILL FOR $19,455.40 TO THE NELSONS**

17         73.    According to Ray and Phyllis Nelson, as of July 2013, VAN SICKLE still

18   had not made any payments on the $20,000 Promissory Note that VAN SICKLE had

19   issued to them during April 2012, when he borrowed funds which were purportedly to be

20   used to facilitate the repayment of their lost investments.

21         74.    My review of VAN SICKLE's phone records has revealed that from

22   May 27, 2012, the date the $20,000 Promissory Note VAN SICKLE issued to the

23   Nelsons became due, to July 31, 2013, the Nelsons called VAN SICKLE 353 times and

24   VAN SICKLE called the Nelsons 150 times.

25         75.    According to Ray Nelson, during these telephone conversations, he

26   repeatedly confronted VAN SICKLE regarding VAN SICKLE's failure to repay the

27   Nelsons the $20,000 VAN SICKLE owed them.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

76.     According to the Nelsons, during late July 2013, VAN SICKLE unexpectedly sent them an Invoice billing them at the rate of $200 per hour - for a total of $19,455.40 - for asset recovery services he purportedly had provided between June 2012, and December 2012.  In addition – appearing to acknowledge that he owed them $20,000 - VAN SICKLE enclosed a refund check for $574.60.

77.     My review of UPS records has confirmed that VAN SICKLE sent documents from Brentwood, California, to the Nelsons, in Kirkland, Washington, on July 31, 2013.  In addition, my review of records for Bank of the West account No. 4174 has revealed that the $574.60 cashier's check that VAN SICKLE sent to the Nelsons was purchased by Van Sickle Business Consulting on that same date.

78.     My review of correspondence between the Nelsons and VAN SICKLE has revealed upon receiving the Invoice and purported refund check, the Nelsons sent VAN SICKLE a letter, dated August 19, 2013, in which they noted that "The $574.60 [refund] is what you say is left of the $20,000 that we loaned to you via an Agreement dated April 27, 2012 for a term of 30 days . . . ."  In addition, they objected that they had never agreed to pay VAN SICKLE an hourly fee, stating:

> We never had any agreement in writing or verbal that you were to be compensated for your time on a per hour basis.  Any pay for work involved in collecting any money from Mr. Sims[1] was on a contingent basis after subtracting our expenses from recovered funds.

On August 21, 2013, VAN SICKLE responded to the Nelsons' letter in an email sent using the email address vansicklebusinessconsulting@gmail.com.  In that email, VAN SICKLE stated that the Nelsons were "aware from the beginning of my billing procedures."

79.     Based on my training and experience, I believe that VAN SICKLE fraudulently submitted this invoice to the Nelsons.  First, VAN SICKLE charged the

---

[1]  Through Lakemont and Larrick, the Nelsons had loaned funds to Osborne Sims.

Agent Cory Cote Affidavit- 20

1  Nelsons in excess of $6,600 – that is, nearly one-third of the total invoiced amount - for

2  traveling to Chicago during September 2012, and November 2012, to meet with Osborne

3  Sims.  Osborne Sims has informed investigators, however, that VAN SICKLE never met

4  him in Chicago.  In addition, a review of all known bank accounts opened by VAN

5  SICKLE has failed to reveal that VAN SICKLE either purchased an airline ticket to

6  Chicago or spent any money in Chicago during the dates that VAN SICKLE charged the

7  Nelsons for traveling to Chicago.  Instead, records for two accounts opened by VAN

8  SICKLE in the name of Van Sickle Business Consulting LLC, that is, Bank of

9  Agriculture account No. 6678 and Bank of West account No. 4174, and two accounts

10 opened by VAN SICKLE in the name of TVS Services LLC, that is, Bank of Agriculture

11 account No. 6756 and Bank of West account No. 4398, reveal that on the dates that VAN

12 SICKLE charged the Nelsons for traveling to Chicago, VAN SICKLE actually was

13 spending money in California.

14        80.     Moreover, my review of the Consulting Agreements that the Nelsons

15 signed has revealed that VAN SICKLE was entitled to (1) a given fee for services and

16 (2) a contingent fee of 15% of funds recovered. [2]  They do not provide that VAN

---

19 [2]  The terms of payment, as set out in the Consulting Agreements the Nelsons signed, are set forth below:

20  • Consulting Agreement signed June 10, 2011:

21    o "Payment to Consultant: The Consultant will be paid a sum of *$10,000* [the sum of $20,000 is
22      crossed out and VAN SICKLE has initialed the change] for investigation services due on the date
      that this agreement is signed.  In addition the Consultant will be paid 15% of the funds recovered
23      at the end of the investigation," for "investigation of recovery of funds against Dan Peterson, Rick
      Ames, and Edward Parker."

24  • Consulting Agreement Amendment dated February 18, 1012 (*sic*):

25    o "Additional Payment to Consultant. The Consultant was paid *$5,000,* on January 16th, 2012 and an
26      additional *$10,000* on February 18th, 2012" to "secure temporary storage facilities, as necessary,
      to assist in recovery of funds from Rick Ames."  [The Agreement provides that, in consideration
27      for providing these additional funds, the Nelsons, along with other investors who provided
      additional funds, shall be repaid first from "available funds."]

28  • Consulting Agreement signed September 13, 2011:

Agent Cory Cote Affidavit- 21

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   SICKLE was entitled to charge the Nelsons by the hour.  I note that, while the website

2   VAN SICKLE set up during February 2012 states that he charges $200 per hour for

3   consulting services, VAN SICKLE created that website approximately six months *after*

4   he had entered into the Consulting Agreements with the Nelsons.

5   **TROY VAN SICKLE'S EFFORT TO DISCUSS WITH THE INVESTORS THEIR**

6   **RESPONSES TO A NEW DFI INVESTIGATION OF RICK AMES**

7       81.    During July 2012, DFI opened a civil administrative investigation it entitled

8   "Larrick Holdings," No. S-12-1042, after investor Len Brandt filed a Complaint in which

9   he represented that he had lost a considerable amount of money making short-term, high-

10   interest loans through Lakemont and Larrick.  In January 2013, DFI sent a questionnaire

11   to Lakemont and Larrick investors, which was to be returned to DFI by February 15,

12   2013.

13       82.    My review of emails provided by Grimes to investigators has revealed that

14   on February 2, 2013, Grimes sent an email to the investors, and a courtesy copy to VAN

15   SICKLE at the email address of info@vansicklebc.com.  Therein, Grimes (1) stated that

16   VAN SICKLE was ready to submit completed questionnaires [to DFI] and move forward

17   with working with legal authorities, and (2) suggested that the investors hold a meeting.

18       83.    In response to that email, an investor sent an email to the other investors

19   stating that the investor group should obtain all the information that VAN SICKLE

20   earlier had gathered and turned over to the FBI regarding Rick Ames, Larry Allen, Dan

21   Petersen, and Ed Parker, among others.  Demonstrating that he had received the

22   investor's email, VAN SICKLE, using the email address of

23   vansicklebusinessconsulting@gmail.com, sent a reply in which he chided the investor for

24   undermining his authority and being ungrateful.

25

26   ───────────────

27         o   "Payment to Consultant: The Consultant will be paid a sum of $5,000 for investigation services
          due on the date that this agreement is signed.  In addition the Consultant will be paid 10% of the

28             funds recovered at the end of this investigation" to "perform an investigation of recovery of funds
          against Sims Investments."

**TROY VAN SICKLE'S FRAUDULENT SUBMISSION OF A FICTITIOUS HOURLY BILL, TOTALING $33,700, TO CHRIS MYERS AFTER MYERS CUTS OFF ALL COMMUNICATION WITH VAN SICKLE**

84.     According to Shelley Grimes, during August 2012, Rick Ames did not issue a new Promissory Note to one of the investors, Chris Myers, because Myers had refused to surrender the Promissory Notes he initially had received when investing through Lakemont.

85.     My review of recorded messages left by VAN SICKLE on Chris Myers' cell phone has revealed, moreover, that by around early-October 2012, Myers had cut off all communications with VAN SICKLE.  For example, on December 30, 2012, VAN SICKLE left a voicemail message for Myers in which VAN SICKLE noted that he had not heard from Myers in three months.

86.     My review of recorded messages left by VAN SICKLE on Chris Myers' cell phone also has revealed that between late-December and early-February 2013 – around the same time that the new DFI investigation of Rick Ames was getting under way - VAN SICKLE made an extraordinary effort to speak with Myers.  And, when he could not get ahold of Myers, VAN SICKLE left voice messages for Myers stating that VAN SICKLE planned to return to Myers his investment documents and send Myers a final bill for VAN SICKLE's services.  For example, among several other messages, VAN SICKLE left Myers the following voicemail messages:

- January 18, 2013: VAN SICKLE states "if you are alive, send me an email" and states that he is planning to box up Myers' material and send him a bill.

- February 8, 2013:  VAN SICKLE states that he had boxed up all of Myers' records and would send a bill by certified mail so that Myers "or the executor of his estate" could sign for it.

87.     My review of United Parcel Service ("UPS") records has revealed that, in fact, on February 15, 2013, VAN SICKLE sent a package to Myers which weighed approximately six pounds.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

88.     My review of recorded messages left by VAN SICKLE on Chris Myers' cell phone has revealed that in response to Myers' failure to accept the package, VAN SICKLE again sought to contact Myers.  That is, on February 19, 2013, VAN SICKLE left a voicemail on Myers' cell phone, stating that (1) UPS was trying to deliver documents to his door, for which Myers needed to sign, and (2) VAN SICKLE knew that Myers had been home because individuals, whom VAN SICKLE had drive past Myers' house, reported back to VAN SICKLE that sometimes Myers' lights were on and sometimes they were off.

89.     According to Grimes and UPS notices left at Myers' house, Myers did not accept delivery of the package, however.

90.     On February 25, 2013, VAN SICKLE, from California, mailed via the United States Postal Services, to Myers, in Sammamish, Washington, an Invoice billing Myers for VAN SICKLE's purported asset recovery services.  The Invoice charged Myers $33,700 for 168.5 hours of services purportedly performed by VAN SICKLE between January 12, 2011, and February 14, 2013.  The Invoice, which was post-dated February 26, 2013, did not identify any of the services that VAN SICKLE purportedly provided during the hours billed for, however.

91.     On February 26, 2013, at 12:54 p.m., Myers was found dead in his front yard**.**  The coroner determined that Myers died of hypothermia (it was 39 degrees out), and ruled the death an accident.

92.     According to Tim Myers, Chris Myers' brother and the executor of Myers' estate, he located the Invoice that VAN SICKLE had mailed to Chris Myers on February 25, 2013, in Chris Myers' mail.  In addition, on Chris Myers' cell phone, Tim Myers located a number of recorded messages from VAN SICKLE.  Tim Myers has produced the Invoice and voicemail messages to investigators.  I have reviewed them, and have referenced them in the preceding paragraphs.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**TROY VAN SICKLE'S FRAUDULENT SUBMISSION OF A FICTITIOUS HOURLY BILL, TOTALING $33,700, TO CHRIS MYERS' ESTATE AFTER MYERS IS FOUND DEAD**

93.     According to Tim Myers, VAN SICKLE called him during May 2013, and asked him if he had found the bill VAN SICKLE had mailed to Chris Myers.

94.     According to Evan Thomas, counsel for Chris Myers' estate, during July 2013, VAN SICKLE's attorney submitted a Creditor's Claim to Thomas, in which VAN SICKLE sought payment in the amount of $33,700 for asset recovery services VAN SICKLE purportedly had provided.  Attached to the Creditor's Claim were:

- a signature page signed by VAN SICKLE;
- Invoices for the months of October 2011, to September 2012, and December 2012, which (1) billed Myers a total of $33,700 for 168.5 hours of asset recovery services and (2) identified with specificity the services that VAN SICKLE purportedly provided; and
- a Consulting Agreement, which purportedly was signed by Myers on June 8, 2011, authorizing VAN SICKLE to charge Myers $200 per hour for asset recovery services.

95.     My review of the fax headers on the signature page and the Consulting Agreement which were attached to VAN SICKLE's Creditor's Claim, has revealed that they were faxed to VAN SICKLE's attorney on July 5, 2013, and July 16, 2013, respectively, using the fax number 925 626-7498.

96.     My review of Comcast records has revealed that VAN SICKLE subscribed to the landline telephone number 925 626-7498, from at least November 13, 2012, through May 2014.

97.     According to Evan Thomas and Tim Myers, during March 2014, they settled VAN SICKLE's $33,700 Creditor's Claim, by agreeing to give VAN SICKLE $7,000, Myers' artwork, and a 60% interest in a $375,000 Judgment Myers had obtained

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

against James DeBolt and Cheryl Oler.[3]  Thomas used the United States Postal Service to mail a check for $7,000 and the assignment of the DeBolt Judgment from Mercer Island, Washington, to Ed Weigelt, counsel for VAN SICKLE, in Everett, Washington.

98.  A review of records for Bank of the West account No. 0676 has revealed that VAN SICKLE deposited the $7,000 check on April 1, 2014, in California.

99.  Based on my training and experience, I believe that VAN SICKLE fraudulently submitted the Creditor's Claim to Chris Myers' estate.  First, with respect to the monthly Invoices which were attached to the Creditor's Claim, I note that the December monthly Invoice states that VAN SICKLE called Myers on December 18, 2012, and discussed "payment options for work performed on files excluding Ames."  In addition, the December monthly Invoice states that on December 12, 2012, Van Sickle held a telephone consultation with Myers during which:

> Recommended client [Chris Myers] pursue the judgment against Deblot (sp).  Debolt has indicated he is willing to settle and remove the judgment on his record.  Discussed Debolt conversation and Debolt considerations.  I strongly recommended client settle on the judgment.

Those conversations never occurred, however.  As noted above, the voicemail messages that VAN SICKLE left on Chris Myers' cell phone reveal that Myers had cut off all communication with VAN SICKLE three months prior to the purported conversations between Myers and VAN SICKLE during December 2012.  Moreover, James DeBolt has informed investigators that he never talked to VAN SICKLE, and does not know who he is.

100.  In addition, with respect to the Consulting Agreement, dated June 8, 2011, I note that if Myers had signed a Consulting Agreement authorizing VAN SICKLE to charge him $200 per hour, I would expect that (1) VAN SICKLE would have had the

---

[3] Through Lakemont, Chris Myers had loaned funds to James DeBolt and Cheryl Oler, who were engaged in a real estate development known as the Silver Lake Executive Resort.  By 2009, DeBolt and Oler had stopped paying Myers on the Promissory Note they had issued to him.  As a result, Myers sued them and, on July 7, 2009, the Pierce County Superior Court issued to him a default Judgment awarding him $375,000 (hereinafter referred to as the "DeBolt Judgment").

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Nelsons (who, during July 2013, VAN SICKLE also sought to charge $200 per hour for his asset recovery services) sign a similar Consulting Agreement, and (2) Chris Myers would have retained it along with other Consulting Agreements he signed.  In fact, VAN SICKLE did not submit a similar Consulting Agreement to the Nelsons, and, according to Tim Myers, he did not locate in Myers' house a Consulting Agreement in which Chris Myers authorized VAN SICKLE to charge Myers $200 per hour.  Rather, in Chris Myers' house, Tim Myers located two other Consulting Agreements, which were signed by Chris Myers on June 8, and June 9, 2011.  In those Consulting Agreements, Chris Myers authorized VAN SICKLE to charge Myers an identified fee, in addition to 15% of the funds VAN SICKLE recovered.

101.    Finally, I note that my review of the emails located in Shelley Grimes' AOL email account and on her computer has revealed that Grimes prepared and emailed to VAN SICKLE at info@vansicklebc.com, (1) the Invoice that VAN SICKLE sent via UPS to the Nelsons during July 2013, (2) the initial Invoice that VAN SICKLE mailed to Chris Myers on February 25, 2013, and (3) the Invoices that VAN SICKLE faxed to his attorney and caused to be submitted to Myers' estate during July 2013.

102.    Grimes admitted to investigators that in creating the detailed Invoices that VAN SICKLE submitted to the Nelsons and Myers' estate, she simply made up all of the tasks that VAN SICKLE purportedly engaged in.   She also admitted that she realized that by doing so, she gave the Invoices an air of legitimacy, which increased the likelihood that the recipients would pay them.  Grimes initially claimed that VAN SICKLE told her over the telephone how many total monthly hours he had worked on Myers' case, and she believed him.  Upon further reflection, however, Grimes stated that she merely "wanted" to believe VAN SICKLE.

## TROY VAN SICKLE'S FRAUDULENT SOLICITATION OF FUNDS FROM PAUL HACKSPIEL

103.    Paul Hackspiel has informed investigators that in addition to investing through Lakemont and Larrick, he loaned $125,000 to real estate developer Tami

Surridge.  In return, Surridge issued Promissory Notes for $75,000 and $50,000, to Paul Hackspiel's son, Manfred, and daughter, respectively.  Paul Hackspiel later took his daughter's position on the Promissory Note issued to his daughter.  This investment also failed to perform as promised.

104.    According to Manfred Hackspiel, VAN SICKLE offered to try to collect from Surridge the funds Paul Hackspiel had invested with her, if Paul Hackspiel would forgive a $50,000 debt that VAN SICKLE owed to him.

105.    My review of documents relating to the agreement between the Hackspiels and VAN SICKLE, has revealed that during late-April 2013, Shelley Grimes presented to the Hackspiels General Agreements which explained that while they were assigning their Promissory Notes to VAN SICKLE, he would "*be working on behalf of Paul and Manfred Hackspiel to endeavor to complete this transaction for their benefit.*" (emphasis added).  The General Agreement also provided that Paul Hackspiel was to deposit $30,000 into an "*Escrow account held by the law firm chosen by Troy Van Sickle to facilitate this transaction to pay any and all legal fees and additional costs associated to complete this transaction.*" (emphasis added).

106.    The documents reveal that on April 25, 2013, Grimes also had Paul and Manfred Hackspiel sign an "Addendum" to the General Agreement which arguably completely changed the Hackspiels' agreement with VAN SICKLE.  That is, it arguably provided that VAN SICKLE was not pursuing litigation against Surridge on behalf of the Hackspiels, but instead, the Hackspiels were agreeing that they would *give* VAN SICKLE (1) the Promissory Notes that Surridge had issued to them, and (2) a total of $30,000, if, in exchange, VAN SICKLE agreed to release the Hackspiels from their obligation to pay VAN SICKLE 15% of any amount that they or their attorney collected from Rick Ames.

107.    A review of bank records has revealed that on the same day he signed the Addendum, Hackspiel purchased two cashier's checks, totaling $30,000, made payable to Van Sickle Business Consulting LLC.  VAN SICKLE deposited the cashier's checks into

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

his Bank of the West account, No. 4174.  Instead of using the money to pay the O'Brien Law Firm, which was handling the litigation relating to the Surridge Promissory Notes, however, VAN SICKLE, among other things, used the funds to make a $21,000 purchase from "Hi Speed," a motorcycle sales business.

108.    According to Grimes and Paul Hackspiel, during October 2013, Hackspiel requested information from Grimes regarding how VAN SICKLE had spent the $30,000 in attorney fees that he had paid VAN SICKLE.

109.    My review of Grimes' email has revealed that on October 20, 2013, Grimes responded to Hackspiel's inquiry by sending an email to VAN SICKLE at info@vansicklebc.com, in which she stated that Paul Hackspiel had asked for copies of all records relating to the attorney working on his case.

110.    According to Grimes, after she made Hackspiel's request known to VAN SICKLE, he faxed to her a law firm billing summary, which she provided to Paul Hackspiel.  My review of that billing summary, which was issued on August 19, 2013, has revealed that it purports to account for all of the $30,000 that Hackspiel had paid to VAN SICKLE.  That is, it provides that the law firm had received payment in the amount of $13,312.50, and held "Currently in Trust 16,687.50."   The fax header on the billing summary reflects that VAN SICKLE had faxed it using his California landline, 925 626-7498.

111.    The billing records that VAN SICKLE faxed to Grimes were altered. Investigators have obtained directly from the O'Brien Law Firm the law firm's actual billing records relating to the Surridge litigation.  Those records reveal that by August 19, 2013, VAN SICKLE had not paid the law firm $13,312.50 as represented, but, instead, had made only a single payment of $2,427 to the law firm.  Moreover, on August 19, 2013, the law firm did not maintain any funds in trust on behalf of VAN SICKLE's or Paul Hackspiel's claim against Surridge.

112.    Based on my training and experience, I believe that VAN SICKLE had Grimes present the altered O'Brien Law Firm billing summary to Paul Hackspiel (who at

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   that time was 80 years of age and who, as VAN SICKLE was aware, confused easily) in

2   order to conceal from Hackspiel the fact that VAN SICKLE later planned to argue that

3   (1) the Hackspiels had agreed to give him their interests in the Surridge Promissory Notes

4   and $30,000, and (2) as a result, VAN SICKLE was entitled to retain all of any settlement

5   he received from Surridge.  By concealing from Paul Hackspiel the fact that VAN

6   SICKLE planned to make this argument, VAN SICKLE could continue to demand that

7   Hackspiel pay VAN SICKLE money for the purported purpose of paying the O'Brien

8   Law Firm to pursue the Surridge litigation.

9        113.   In fact, according to Grimes, on January 13, 2014, and again on February 7,

10   2014, VAN SICKLE and or Grimes, acting at VAN SICKLE's direction, informed Paul

11   Hackspiel that he must come up with additional attorney fees totaling $30,000.

12       114.   A review of bank records has confirmed that on January 13, 2014, and

13   February 7, 2014, Hackspiel wired from his Union Bank account, directly to VAN

14   SICKLE's Bank of West account, funds totaling $30,000.  The records further reveal that

15   of this $30,000, VAN SICKLE used only a total of $5,500 to pay attorney fees in support

16   of the Surridge litigation.

17       115.   My review of a Settlement Agreement provided to investigators by

18   Surridge's counsel, Donald Bailey, has revealed that during April 2014, Tami Surridge

19   agreed to pay $150,000 in order to settle litigation relating to the Promissory Notes she

20   had issued to the Hackspiels.

21       116.   According to Manfred Hackspiel, around August 2014, Grimes called him

22   and informed him that VAN SICKLE was going to steal the Surridge settlement funds.

23   According to Manfred Hackspiel, after he subsequently called the attorney who had

24   handled the litigation against Surridge, VAN SICKLE sent an email to Manfred.

25       117.   My review of that email has revealed that VAN SICKLE sent it on

26   August 1, 2014, using the email address of vansickleconsulting@gmail.com.  In it, VAN

27   SICKLE stated that "I want to make clear that the Tami Surridge deal is my deal . . . .

28

1  So, please respond back if you or your father are making any type of claim regarding
2  that."

3      118.   According to Manfred Hackspiel, during a subsequent telephone call, VAN
4  SICKLE told Manfred that he needed to write an email to VAN SICKLE stating that he
5  would not claim the Surridge settlement funds.  VAN SICKLE assured Manfred that in
6  doing so, (1) he would facilitate both VAN SICKLE *and the Hackspiels* getting paid and
7  (2) that when VAN SICKLE came to Seattle, both Paul and Manfred would be "floating"
8  in money.

9      119.   My review of AT&T phone records has revealed that, in fact, on August 2,
10  2014, VAN SICKLE, using a newly subscribed cell phone number, 442 227-6210, spoke
11  with Manfred Hackspiel for approximately 13 minutes.

12      120.   According to Manfred Hackspiel, as a result of this conversation, he sent an
13  email to VAN SICKLE at vansickleconsulting@gmail.com, which he has provided to
14  investigators.  In that email, which is dated August 2, 2014, Manfred Hackspiel stated to
15  VAN SICKLE that he was "sorry if [he had] caused any distraction in your Tami
16  Surridge deal" and "we will not cause any further inconveniences."

17      121.   A review of records for VAN SICKLE's First Bank account, No. 5030, has
18  revealed that, pursuant to the Settlement Agreement, during August 2014, the O'Brien
19  Law Firm issued a check from its trust account to VAN SICKLE for $130,000.  Upon
20  depositing that check, VAN SICKLE transferred $80,000 to an account at Wells Fargo
21  Bank, opened in the name of Atlantic Management, before using $26,749 to make a
22  payment toward the purchase of a McLaren Mercedes from X Motorsports.

23      122.   According to Manfred Hackspiel, VAN SICKLE never gave him or his dad
24  any money from the settlement VAN SICKLE reached with Surridge.

25  **TROY VAN SICKLE'S FRAUDULENT THEFT OF REAL ESTATE FROM**
26  **SHELLEY GRIMES**

27      123.   According to Grimes, she and her two brothers inherited a property in
28  Edmonds, Washington, which was leased by a bank.  When she subsequently took out a

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  loan from one of her brothers, Mark Bucklin, she gave him her one-third interest as

2  collateral.

3      124.   According to Grimes, during July 2012, VAN SICKLE told Grimes that

4  she had to get her interest in the property out of her name so that her brother could not

5  seize it if she failed to repay him on the loan.  In order to do so, VAN SICKLE and

6  Grimes created documents reflecting a fictitious loan by VAN SICKLE to Grimes, with

7  the idea that they subsequently would claim that Grimes failed to repay the loan, and

8  VAN SICKLE would take title to the property in what appeared to be a legitimate arms-

9  length transaction.   In addition to creating the fictitious loan documents, they

10 fraudulently sought to document the purported loan through the sending of an email from

11 Grimes to VAN SICKLE, at info@vansicklebc.com, in which Grimes thanked VAN

12 SICKLE for lending her money.

13     125.   My review of documents recorded with Snohomish County, has revealed

14 that on January 7, 2013, Grimes signed a Deed in Lieu of Foreclosure, thereby

15 transferring title to the property to VAN SICKLE.

16     126.   According to Grimes, she and VAN SICKLE planned to use the proceeds

17 from the eventual sale of the Edmonds property in order to open a store from which they

18 would sell vintage cars, motorcycles and motorcycle memorabilia.  Prior to opening the

19 store with Grimes, VAN SICKLE would leave his wife in California and return to

20 Washington.  In fact, during March 2014, Grimes formed an LLC, that is, TroShel LLC

21 (which stands for Troy and Shelley) for the purpose of opening the store with VAN

22 SICKLE.

23     127.   Mark Bucklin has informed investigators that during approximately early-

24 2014, Grimes told him that she had defaulted on a loan she had taken out from VAN

25 SICKLE, and that VAN SICKLE now owned her interest in the Edmonds property.

26 Bucklin then purchased Grimes' one-third interest in the property from VAN SICKLE for

27 $750,000.

28

Agent Cory Cote Affidavit- 32

128.   According to Grimes, while she was aware that VAN SICKLE was discussing the sale of the property with Bucklin, VAN SICKLE (1) did not tell her that he actually had sold the property to Bucklin and (2) did not use any portion of the sale proceeds to open the store that they planned to operate together.

129.   A review of bank records has confirmed that, in fact, VAN SICKLE did not use any of the funds from the sale of the Edmonds property to open a store in Washington State.  Rather, on January 24, 2014, VAN SICKLE deposited in excess of $650,000 of the funds into his Bank of West account, No. 5509, before wiring a substantial portion of those funds through two additional bank accounts, including a Wells Fargo account, No. 8730, opened in the name of Atlantic Management LLC.  On April 15, 2014, VAN SICKLE wired $562,000 of the funds from the Wells Fargo Atlantic Management account to West Coast Escrow before applying the money toward the purchase of a house in Palm Springs, California.

130.   A review of records for Wells Fargo Bank account No. 8730, opened in the name of Atlantic Management LLC, has revealed that (1) VAN SICKLE opened the account on the same day that he wired the funds he received from Mark Bucklin into it and (2) Atlantic Management LLC does not conduct any standard business operations.  In fact, a review of Wyoming Secretary of State records has revealed that VAN SICKLE created Atlantic Management LLC less than a month before VAN SICKLE opened the Wells Fargo bank account in that name.  Based on my training and experience, I believe that VAN SICKLE transferred the proceeds from the sale of the Edmonds property, through Atlantic Management's Wells Fargo Bank account, No. 8730, in order to conceal the true source and the location of the funds.

**TROY VAN SICKLE'S FRAUDULENT THEFT OF FUNDS FROM INVESTORS WHO BELIEVED THEY WERE INVESTING IN A HOUSE HELD BY CHRIS MYERS' ESTATE**

131.   According to Manfred Hackspiel, during the Summer of 2014, VAN SICKLE called Manfred and requested that he convince his dad, Paul Hackspiel, to take

1  out a $100,000 loan in order to invest in Chris Myers' house, which was then held by

2  Myers' estate.  In addition, VAN SICKLE suggested that Manfred invest $40,000 that he

3  had inherited in the house.  According to Manfred Hackspiel, while he and his dad went

4  with Shelley Grimes to look at Myers' house, they decided not to invest in it.

5      132.    My review of AT&T phone records has revealed that, in fact, on May 16,

6  2014, VAN SICKLE, using cell phone No. 925 470-0501, spoke on the telephone with

7  Manfred Hackspiel for approximately nine minutes.

8      133.    Debra and Bruno Bouchegnies have informed investigators that around

9  June 2014, Shelley Grimes offered them a $16,000 return on a $30,000 loan, which

10  Grimes represented she and her business partner would use to purchase Myers' house.

11  Pursuant to Grimes' offer, they loaned her the $30,000.

12      134.    My review of records obtained from Redmond Rare Coins has revealed that

13  on June 3, 2014, Grimes used the Bouchegnies' $30,000 to make a deposit on a gold bar

14  weighing one kilogram, and that on June 5, 2014, she completed paying for the gold bar.

15      135.    My review of FedEx records has revealed that on June 11, 2014, Grimes

16  sent a package weighing six pounds from Redmond, Washington, to VAN SICKLE, in

17  Palm Desert, California.

18      136.    Irina Lysyak and Iryna Guseva have informed investigators that during

19  June 2014, Grimes offered them a total return of $18,000 if they loaned her $45,000 in

20  order to purchase Myers' house.  Grimes told them that she would personally hand-

21  deliver the funds to California on the day of closing.  Relying on Grimes' representations,

22  on July 1, 2014, Lysyak and Guseva each transferred $22,500 to Grimes' bank account.

23      137.    My review of records obtained from Redmond Rare Coins has revealed that

24  instead of hand-delivering their funds to California on the day of closing, on July 2, 2014,

25  Grimes used Lysyak's and Guseva's funds to purchase a gold bar weighing one kilogram.

26      138.    My review of FedEx records has revealed that on July 9, 2014, Grimes sent

27  a package weighing almost seven pounds from Redmond, Washington, to VAN SICKLE,

28  in Palm Desert, California.

Agent Cory Cote Affidavit- 34

1   139.   Grimes did not repay the Bouchegnies, Lysyak, and Guseva their principal

2   investments or pay them the returns she promised.  According to Lysyak and the

3   Bouchegnies, Grimes met with them on July 29, 2014.  At that time, Grimes told them

4   that she had used their money to buy gold bars and sent the bars to her California

5   business partner, but that he had not purchased Myers' house.  She also told Lysyak that

6   they should not contact her California connection because he was dangerous and

7   connected.

8   140.   According to Tim Myers, neither Grimes nor VAN SICKLE attempted to

9   purchase Chris Myers' house from the estate.

10  **TROY VAN SICKLE'S FRAUDULENT THEFT OF $50,000 FROM SHELLEY**

11  **GRIMES**

12  141.   According to Shelley Grimes, during September 2011, she took out a loan

13  in order to purchase classic motorcycles through VAN SICKLE.  By July 2014, the

14  outstanding balance on that loan was $210,000.  According to Grimes, during July 2010,

15  VAN SICKLE told her that if she sent him $50,000 in cash, he would provide the

16  remaining $160,000 in order to pay off the loan.  According to Grimes, because she had

17  given a cabin she owned on Whidbey Island as collateral for the loan, and she did not

18  want to lose it, she withdrew the remaining $50,000 from her husband's retirement

19  account.  Pursuant to VAN SICKLE's directive, she sent it, in the form of cash, to VAN

20  SICKLE via FedEx.  According to Grimes, VAN SICKLE did not use any portion of the

21  funds she sent him in order to pay off the loan, however.

22  **TROY VAN SICKLE'S MANUFACTURED DEFENSE TO ALLEGATIONS**

23  **THAT HE FRAUDULENTLY STOLE FUNDS FROM INVESTORS WHO**

24  **BELIEVED THEY WERE INVESTING IN A HOUSE HELD BY CHRIS MYERS'**

25  **ESTATE**

26  142.   My review of documents obtained from Grimes has revealed that during

27  July 2014, Ed Weigelt sent Grimes an Affidavit providing that VAN SICKLE was not

28  associated with Troshel LLC and that she and VAN SICKLE were not "partners, co-

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  investors, co-sponsors, or co-owners of any business or investment opportunity."  Grimes
2  signed that Affidavit, under penalty of perjury, on July 22, 2014.

3       143.    According to Grimes, she signed the Affidavit because VAN SICKLE told
4  her that in order to convince Myers' estate to sell them the remaining 40% of the
5  $375,000 De Bolt judgment, it would be better if it appeared that VAN SICKLE and
6  Grimes were not in business together.

7  **TROY VAN SICKLE'S DISSASSOCIATION WITH SHELLEY GRIMES**

8       144.    According to Shelley Grimes, after she signed the Affidavit on July 22,
9  2014, she repeatedly tried to call VAN SICKLE but could not reach him.  Investor Dave
10  Norwood then informed Grimes that VAN SICKLE had called him and directed him to
11  tell Grimes that VAN SICKLE could never talk to Grimes again.  As discussed above,
12  Grimes then notified Irina Lysyak, the Bouchegnies, and Manfred Hackspiel that VAN
13  SICKLE had planned to steal their funds.

14  **TROY VAN SICKLE'S FALSE AND FRAUDULENT DEPOSITION**
15  **TESTIMONY**

16       145.    My review of Grimes' email has revealed that on August 3, 2014, VAN
17  SICKLE, using the email address vansickleconsulting@gmail.com, sent Grimes an email
18  in which he accused Grimes of "opening two LLCs not letting me know bank accounts
19  and using my name on financial loans signing my name."

20       146.    Based on my training and experience, I believe that VAN SICKLE
21  anticipated that his conduct in this District would result in civil and criminal
22  investigations and that he sent this email in an effort to begin fabricating a defense with
23  respect to any charges arising from those investigations.

24       147.    In fact, during August 2014, Debra and Bruno Bouchegnies complained to
25  DFI that they recently had lost $30,000 which they had invested with Shelley Grimes for
26  the purpose of buying and selling a house held by Chris Myers' estate.  As a result of that
27  complaint, DFI opened an administrative investigation it entitled "Surreal Holdings," No.
28  S-14-1550.

1    148.    Pursuant to its administrative proceeding, on September 13, 2016, DFI

2  deposed VAN SICKLE.  As further discussed below, based on my training and

3  experience, I believe that the evidence amply demonstrates that VAN SICKLE (who has

4  previously been convicted of felonies involving dishonesty, including Perjury, Theft 1,

5  Unlawful Issuance of Bank Checks, and Possession of Stolen Property) testified falsely.

6                    *Testimony Relating to Romantic Relationship with Shelley Grimes*

7    149.    During the deposition, VAN SICKLE was asked the following questions

8  and gave the following answers, during which he denied having a personal relationship

9  with Shelley Grimes:

10                           Q:  Did you have – did you have a personal relationship with Ms.

11                           Shelley Grimes?

12                           A:  What?  Absolutely not.

13                           Q:  Did you have an affair with Ms. Shelley Grimes.

14                           A:  No.

15    150.    Based on my training and experience, I believe that VAN SICKLE's

16  testimony was false.  I note that VAN SICKLE, who at the time was married, sent text

17  messages to Grimes which included nude photos of himself.  In those photos, he is

18  readily identified as his face is clearly visible.  In addition, he sent numerous texts to

19  Grimes, in which he proposed marriage.  Those photos and proposals can only be

20  explained in the context of his having an affair with Grimes.

21                          *Testimony Relating to Promissory Notes*

22    151.    During VAN SICKLE's deposition, when specifically asked if he had told

23  Shelley Grimes he needed $100,000 to open a bank account in order to receive money

24  from Ed Parker, VAN SICKLE denied that he had done so.  VAN SICKLE testified that

25  while he had issued some Promissory Notes to investors, he had repaid all the loans, with

26  the exception of one loan from Dave Norwood.  VAN SICKLE also testified that Grimes

27  was collecting money on his behalf, but he didn't know what she was doing.

28

Agent Cory Cote Affidavit- 37

152.     Based on my training and experience, I believe that VAN SICKLE's testimony was false.  First, Grimes included VAN SICKLE on the email she sent to investors in which she represented that, while VAN SICKLE would personally contribute $25,000, he needed to borrow $75,000 in order to deposit $100,000 into a bank account that he intended to use to facilitate the recovery of their lost investments from Ed Parker. Rather than notifying Grimes that she had misstated the facts, VAN SICKLE not only accepted the investors' money - which he immediately spent and concealed - he worked with Grimes in producing the Promissory Notes in which he promised to repay the investors in 30 days.  As discussed above, moreover, a review of VAN SICKLE's bank accounts has revealed that he did not repay any of the investors from whom he borrowed a total of $75,000 and to whom he issued Promissory Notes.

153.     VAN SICKLE also testified that the $574 he returned to the Nelsons was what was left of their $20,000 retainer after deducting his hourly fees.

154.     Based on my training and experience, I believe this testimony also was false.  As noted above, the Nelsons never agreed to pay VAN SICKLE an hourly fee. And, other than the $20,000 loan they made to VAN SICKLE, for which he issued a Promissory Note, the Nelsons did not make any $20,000 payments to VAN SICKLE.

*Testimony Relating to The Hackspiels*

155.     VAN SICKLE testified that by the time he stopped pursuing collection efforts against Rick Ames, Paul Hackspiel owed him several thousand dollars, so Hackspiel said "Hey, instead of paying you this sum of money, why don't I give you the assignment of judgment from [the Surridge] promissory note?"

156.     Based on my training and experience, I believe this testimony was false.  I note that if Paul Hackspiel had knowingly given his Surridge Promissory Note to VAN SICKLE, VAN SICKLE would not have had an incentive to falsify an O'Brien Law Firm bill to make it appear that VAN SICKLE paid the $30,000 that Hackspiel gave him to the O'Brien Law Firm.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**TROY VAN SICKLE'S EMAIL TO SHELLEY GRIMES AROUND THE TIME SHE FILED FOR BANKRUPTCY**

157.     According to Shelley Grimes, she filed for bankruptcy during 2016.  In doing so, she claimed that VAN SICKLE owed her $1.5 million.  Thereafter, that is, on September 30, 2016, VAN SICKLE, using the email address of vansickleconsulting@gmail.com, sent Grimes an email with the subject line of "smoking gun."  Attached to it was Grimes' July 2014 Affidavit in which she averred that Grimes and VAN SICKLE had never been business partners.

## IV.  BACKGROUND CONCERNING EMAIL

158.     In general, an email message that is sent to an Internet Service Provider (Provider) is stored in the subscriber's "mail box" on the Providers' servers until the subscriber deletes the message.  If the subscriber does not delete the message, the message can remain on the Providers' servers indefinitely. Even if the subscriber deletes the message, it may continue to be available on the Providers' servers for a certain period of time.

159.     In my training and experience, I have learned that Dreamhost, Google, Yahoo, and Microsoft provide a variety of on-line services, including electronic mail ("email") access, to the public.  Subscribers obtain an account by registering with Dreamhost, Google, Yahoo, and Microsoft.  During the registration process, Dreamhost, Google, Yahoo, and Microsoft ask subscribers to provide basic personal information. Google, Yahoo, and Microsoft allow subscribers to obtain email accounts at the domain name info@_____.com, gmail.com, yahoo.com, and hotmail.com, respectively, like the email account[s] listed in Attachment A.  Therefore, the computers of Dreamhost, Google, Yahoo, and Microsoft are likely to contain stored electronic communications (including retrieved and unretrieved email for Dreamhost, Google, Yahoo, and Microsoft subscribers) and information concerning subscribers and their use of Dreamhost, Google, Yahoo, and Microsoft services, such as account access information, email transaction information, and account application information.  In my training and experience, such

Agent Cory Cote Affidavit- 39

1    information may constitute evidence of the crimes under investigation because the

2    information can be used to identify the account's user or users.

3        160.    A subscriber to Dreamhost, Google, Yahoo, and Microsoft can also store

4    his or her files with the provider such as address books, contact or buddy lists, calendar

5    data, pictures (other than ones attached to emails), and other files, on servers maintained

6    and/or owned by Dreamhost, Google, Yahoo, and Microsoft.  In my training and

7    experience, evidence of who was using an email account may be found in address books,

8    contact or buddy lists, email in the account, and attachments to emails, including pictures

9    and files.

10        161.    In my training and experience, email providers generally ask their

11    subscribers to provide certain personal identifying information when registering for an

12    email account.  Such information can include the subscriber's full name, physical

13    address, telephone numbers and other identifiers, alternative email addresses, and, for

14    paying subscribers, the means and source of payment (including any credit or bank

15    account number).  In my training and experience, such information may constitute

16    evidence of the crimes under investigation because the information can be used to

17    identify the account's user or users.  Based on my training and my experience, I know

18    that, even if subscribers insert false information to conceal their identity, this information

19    often provides clues to their identity, location, or illicit activities.

20        162.    In my training and experience, email providers typically retain certain

21    transactional information about the creation and use of each account on their systems.

22    This information can include the date on which the account was created, the length of

23    service, records of log-in (i.e., session) times and durations, the types of service utilized,

24    the status of the account (including whether the account is inactive or closed), the

25    methods used to connect to the account (such as logging into the account via the

26    provider's website), and other log files that reflect usage of the account.  In addition,

27    email providers often have records of the Internet Protocol address ("IP address") used to

28    register the account and the IP addresses associated with particular logins to the account.

Agent Cory Cote Affidavit- 40

Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

163.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

164.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  stored at the user's account may further indicate the geographic location of the account

2  user at a particular time (e.g., location information integrated into an image or video sent

3  via email).  Last, stored electronic data may provide relevant insight into the email

4  account owner's state of mind as it relates to the offense under investigation. For

5  example, information in the email account may indicate the owner's motive and intent to

6  commit a crime (e.g., communications relating to the crime), or consciousness of guilt

7  (e.g., deleting communications in an effort to conceal them from law enforcement).

## V.  PAST EFFORTS TO OBTAIN EVIDENCE

9      165.   To my knowledge, there have been no other prior attempts to secure a

10  search warrant to search and seize these records.

## VI.  PROTOCOL FOR SEARCH OF EMAIL ACCOUNTS BY FILTER TEAM

12      166.   In order to ensure that agents are limited in their search only to the contents

13  of the SUBJECT EMAIL ACCOUNTS and any attachments, stored instant messages,

14  stored voice messages, documents, and photographs associated therewith; in order to

15  protect the privacy interests of other third parties who have accounts with the Providers;

16  and in order to minimize disruptions to the normal business operations of  Dreamhost,

17  Google, Yahoo, and Microsoft; this application seeks authorization to permit agents and

18  employees of Dreamhost, Google, Yahoo, and Microsoft to assist in the execution of the

19  warrant, pursuant to 18 U.S.C. § 2703(g), as follows:

20          a.    The search warrants will be presented to Dreamhost, Google, Yahoo,

21  and Microsoft, with direction that they identify and isolate the SUBJECT EMAIL

22  ACCOUNTS and associated records described in Section I of Attachment B.

23          b.    Dreamhost, Google, Yahoo, and Microsoft will also be directed to

24  create an exact duplicate in electronic form of the SUBJECT EMAIL ACCOUNTS and

25  associated records specified in Section I of Attachment B, including an exact duplicate of

26  the content of all email messages stored in the SUBJECT EMAIL ACCOUNTS.

27          c.    Dreamhost, Google, Yahoo, and Microsoft shall then provide an

28  exact digital copy of the contents of the SUBJECT EMAIL ACCOUNTS, as well as all

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   other records associated with the accounts, to me, or to any other agent of the FBI.  Once

2   the digital copies have been received from Dreamhost, Google, Yahoo, and Microsoft,

3   the copies will, in turn, be forensically imaged and only those images will be reviewed

4   and analyzed to identify communications and other data subject to seizure pursuant to

5   Section II of Attachment B.  The original digital copies will be sealed and maintained to

6   establish authenticity, if necessary.

7           d.     During the course of this investigation, I have learned that TROY

8   VAN SICKLE has been represented by legal counsel, including Stephen Smith, Ed

9   Weigelt, Michael Essig, Mark Mestel, and Pete Mazzone.  Because TROY VAN

10   SICKLE is known to have legal representation, I anticipate that electronically stored

11   information (ESI), which is potentially protected by the attorney-client privilege, may be

12   among the items found during the search.  To prevent the disclosure of privileged

13   information to case agents, investigators, and prosecutors assigned to the investigation,

14   one agent (the "taint/ESI filter" agent) and one Assistant United States Attorney (AUSA)

15   (the "taint counsel") will be assigned to serve as a taint/ESI filter team.  The members of

16   the taint/ESI filter team will have no prior involvement in the investigation, and will have

17   no further role in the investigation or prosecution of this case, unless some further

18   privilege issue arises, requiring additional review, or unless some aspect of the taint team

19   review is litigated in court.  The taint team members will not reveal the contents of any

20   documents or files determined to contain privileged material to any other person, except

21   counsel for a subject of a search warrant or holder of a privilege, unless otherwise

22   ordered by the court.

23           e.     The "taint/ESI filter" agent of the FBI will review the forensic

24   image, and identify from among that content those items that come within the items

25   identified in Section II to Attachment B for seizure.  The "taint/ESI filter" agent of the

26   FBI will then copy those items identified for seizure to separate media for future use in

27   the investigation and prosecution.  The forensic copy of the complete content of the email

28   accounts will also then be sealed and retained by the FBI, and will not be unsealed absent

1   Court authorization, except for the purpose of duplication of the entire image in order to

2   provide it, as discovery, to a charged defendant.

3       167.   Analyzing the data contained in the forensic image may require special

4   technical skills, equipment, and software.  It could also be very time-consuming.

5   Searching by keywords, for example, can yield thousands of "hits," each of which must

6   then be reviewed in context by the examiner to determine whether the data is within the

7   scope of the warrant.  Merely finding a relevant "hit" does not end the review process.

8   Keywords used originally need to be modified continuously, based on interim results.

9   Certain file formats, moreover, do not lend themselves to keyword searches, as keywords

10  search text, and many common electronic mail, database, and spreadsheet applications

11  (which may be attached to email) do not store data as searchable text.  The data is saved,

12  instead, in proprietary non-text format.  And, as the volume of storage allotted by service

13  providers increases, the time it takes to properly analyze recovered data increases as well.

14  Consistent with the foregoing, searching the recovered data for the information subject to

15  seizure pursuant to this warrant may require a range of data analysis techniques and may

16  take weeks or even months.

17      168.   Based upon my experience and training, and the experience and training of

18  other agents with whom I have communicated, it is necessary to seize all emails, chat

19  logs and documents, that identify any users of the SUBJECT EMAIL ACCOUNTS and

20  any emails sent or received in temporal proximity to incriminating emails that provide

21  context to the incriminating communications.

22      169.   All forensic analysis of the image data will employ only those search

23  protocols and methodologies reasonably designed to identify and seize the items

24  identified in Section II of Attachment B to the warrant.

25  ///

26  ///

27  ///

28

Agent Cory Cote Affidavit- 44

1

## VII. CONCLUSION

2    170.    Based on the forgoing, I request that the Court issue the proposed search

3 warrant.  Because the warrant will be served on Dreamhost, Google, Yahoo, and

4 Microsoft, who will then compile the requested records at a time convenient to it,

5 reasonable cause exists to permit the execution of the requested warrant at any time in the

6 day or night.

7                                    _____

8                                    CORY COTE, Special Agent
                                     Federal Bureau of Investigation
9

10       Subscribed and sworn to me by telephone on January 18, 2019

11

12

13                                    _____

14                                    BRIAN A. TSUCHIDA
                                      United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Agent Cory Cote Affidavit- 45